## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| ERNESTO ESPINOZA, on behalf of himself ) and all others similarly situated ) ) Plaintiff, ) ) vs. ) ) RICHARD M. WHITING and ) MARK N. SCHROEDER, ) ) Defendants ) ) | No. 4:12cv1711 SNLJ No. 4:12cv1815 RSW No. 4:12cv2167 FRB CONSOLIDATED |

## MEMORANDUM

This securities class action is before the Court on defendants' Motion to Dismiss (#54). After an extended briefing schedule, the motion is ripe for disposition.

## I.    Background

This case was brought on behalf of all persons who purchased Patriot Coal Corporation securities between October 21, 2010 and July 6, 2012. Nonparty Patriot Coal is a coal company based in St. Louis with coal operations and reserves in the central and eastern United States. Defendants are Patriot's former Chief Executive Officer Richard Whiting and former Chief Financial Officer Mark Schroeder. The Consolidated Class Action Complaint (#51) is brought pursuant to Section 21D(a)(3)(B) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78u-4(a)(3)(B), as amended by Section 101(b) of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). The

defendants are alleged to have made false and misleading statements concerning Patriot Coal's court-ordered environmental remediation efforts.

### A.    Remediation Obligations, Accounting Methods, and Bankruptcy

In July 2008, Patriot Coal acquired two coal mining operations in West Virginia known as the Apogee and Hobet mining complexes. Both Apogee and Hobet are surface mining operations, in which surface soil and rock are removed to reveal underlying coal deposits. As rock is disturbed during the mining process, selenium — a naturally-occurring element — may be swept into water flows. Selenium is toxic at high concentrations, so environmental agencies regulate its presence in water flows leaving the mines ("effluent"). Selenium water contamination originating from the Apogee and Hobet mines was the subject of lawsuits brought in 2007 and 2008 in federal court in West Virginia. The mines were accused of violating their mining permits with respect to the selenium effluent levels. Patriot acquired the two mines while that litigation was pending.

In March 2009, the parties to those lawsuits resolved the matters through consent decrees which provided that Patriot would work on selenium reduction techniques and comply with specific selenium limits by April 5, 2010. Patriot implemented a water treatment technology called Zero Valent Iron ("ZVI"), which, according to defendants, is a system based on plastic tanks that are replaced on a "short-term" basis. Patriot treated costs associated with those measures as expenses, recording approximately $20 million in liabilities and associated expenses in publicly filed reports.

On September 1, 2010, the West Virginia federal court ordered that Patriot implement a Fluidized Bed Reactor ("FBR") system at the Apogee facility. The Court ordered Patriot to come up with a plan for the Hobet facility, and it later ordered Patriot to implement an Advanced Biological Metals ("ABMet") system at the Hobet facility. The court-ordered obligations to install the FBR and ABMet facilities are the "Remediation Obligations" which precipitated this litigation.

The FBR and ABMet facilities are quite different from the ZVI method of selenium remediation. For example, the FBR facility includes multiple buildings, large steel tanks, and an on-site laboratory, and it covers an area over two football fields in length. It is also more expensive and had an expected lifespan of 30 years. Patriot disclosed in an August 31, 2010 press release that Apogee had been ordered to install the FBR facility and that "the initial investment required as part of the [court] judgment will be approximately $50 million" with annual operating costs of $3 million. The press release also disclosed that the court required Patriot to secure a $45 million letter of credit to secure its obligations.

On the first day of the Class Period, October 21, 2010, Patriot issued a press release explaining that it would record an expense of $20.7 million related to ongoing operating costs for the FBR facility, and that it would account for the estimated $50 million in costs to install the facility as a "capital investment." After the ABMet facility was ordered, Patriot disclosed that it would "record the costs to install the [ABMet facility] as capital expenditures when incurred." Patriot Coal did just that in its public filings with the

-3-

Securities and Exchange Commission ("SEC").

In September 2011, the SEC sent a letter to defendant Whiting questioning Patriot's accounting for its Remediation Obligations. In the eight months that followed, Patriot's officers exchanged numerous letters and phone calls with the SEC, attempting to justify their treating the Remediation Obligations as capital expenditures rather than expenses. Patriot explained that because the Apogee and Hobet mining complexes contained active and inactive mining areas directly adjacent to each other, the treatment facilities were expected to treat water flows from both active and inactive operations. The company therefore determined, based on accounting guidance found in the Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 410-30, that the FBR and ABMet facilities should be capitalized — i.e., treated as long term assets rather than as expenses. Patriot represented that the remediation facilities' ability to add value to the company's future operations warranted capitalization.

During the pendency of its communications with the SEC about its Remediation Obligations accounting, Patriot filed its Form 10-K for the year ended December 31, 2011 on February 23, 2012. In that filing, Patriot disclosed that it was capitalizing the costs of the Remediation Obligations but that it had received comments from the SEC regarding its selenium water treatment requirements and that the comments were unresolved. Patriot's independent auditor, Ernst & Young, issued an audit opinion for the company's 2011 year-end financial statements, which expressed the opinion that Patriot's financial statements

"present fairly, in all material respects, the consolidated financial position" of the company "in conformity with U.S. generally accepted accounting principles." Further, Ernst & Young opined that Patriot "maintained, in all material respects, effective internal control over financial reporting."

However, as a result of the SEC's continued questioning, on May 8, 2012, Patriot issued a restatement of its previously issued consolidated financial statements to accrue a liability and corresponding expense and recognize a loss for the estimated costs of the Remediation Obligations. The result was that Patriot's asset retirement obligation ("ARO") liability and net losses increased by $23.6 million and $49.7 million for the years ended December 31, 2011 and 2010, respectively.[1] In addition, Patriot admitted that management had identified a control deficiency in its internal controls over financial reporting associated with the accounting treatment for the Remediation Obligations that constituted a "material weakness." Patriot Coal's share price dropped from $5.53 on May 8, 2012 to $5.31 on May 9, 2012.

In that same May 8 restatement, which was contained in a Form 8-K, Patriot Coal issued a revenue forecast for 2013. A week later, on May 15, 2012, Patriot filed another Form 8-K with the SEC revising that sales forecast significantly downward. The form

---

[1]According to the complaint, "An ARO is a liability recorded to acknowledge and measure the present value of the obligation in the future to incur cost to retire a given tangible asset. The obligation typically arises because of a contractual or governmental requirement to remove the asset and restore the property on which the asset sits to a condition comparable to the condition of the property prior to the construction of the asset. The obligation typically includes the cost of environmental mitigation associated with removal of the asset." (#51 at ¶ 9 n.3.)

explained that it was revising its forecast "based on recent developments involving the potential default by a key customer." (#51 at ¶ 57.) Patriot's share price dropped from $4.83 on May 14 to $3.94 on May 15.

Next, on May 22, 2012, Patriot Coal filed another Form 8-K, which published a letter that defendant Whiting authored and sent to company employees. The letter discussed the company's struggles related to its capital position and stated that the company had "engaged The Blackstone Group," a financial company well-known for its role in assisting companies restructure their debt, "to achieve an optimal financing package." Plaintiffs describe the letter as "upbeat," as it provided assurances to investors that "operations are performing well" and that the company is positioned for "future growth." (#51 at ¶ 59.) Patriot's share price dropped from $3.36 on May 21 to $2.18 on May 22.

On July 9, 2012, Patriot Coal issued a press release announcing that it had filed for bankruptcy. Patriot announced that it had "taken this action in order to undertake a comprehensive financial restructuring." The press release further stated that the company had suffered from "challenging environmental regulations affecting the cost of producing and using coal" and "rising expenditures for environmental and other liabilities [that] severely constrained the Company's liquidity and financial flexibility." Patriot's share price fell from $2.91 on July 6 to $0.61 by the market's close on July 9.

Later in 2012, the plaintiffs filed this lawsuit on behalf of themselves and others

who purchased Patriot Coal shares between October 21, 2010 and July 6, 2012.

**B.      Alleged Materially False and/or Misleading Statements**

Plaintiffs allege that the following false and/or misleading statements were made by the defendants:

- The October 21, 2010 press release falsely stated that the $50 million in Remediation Obligations would be "capital investment."  That accounting treatment did not conform to applicable financial reporting requirements.

- The November 5, 2010 form 10-Q further explained how the company would account for the Remediation Obligations.  It included consolidated financial statements of the company's operations for the quarter ending September 30, 2010, and it failed to comply with GAAP because the Remediation Obligation costs should have been recognized as expenses.  As a result, the company's liabilities and expenses were understated, boosting the company's financial results.

- The November 5, 2010 Form 10-Q also falsely certified that the company's internal controls over financial reporting were adequate.

- A February 1, 2011 press release emphasized higher earnings before interest, taxes, depreciation, and amortization ("EBITDA") and "improved operating costs," but those statements (made by defendant Schroeder) were based on improper accounting described above.

- During a February 1, 2011 conference call, defendant Whiting noted "significant improvement" in the company's "operating results," and defendant Schroeder confirmed that the company's absolute costs had declined, but those results only appeared to be the case because of the improper accounting for the Remediation Obligations.

Similar alleged misstatements are alleged to have been made by the defendants in the following contexts:

- The February 25, 2001 Form 10-K consolidated financial statements for 2010

- The February 25, 2011 certifications pursuant to the Sarbanes-Oxley Act of 2002

- A March 24, 2011 presentation at the Barclays Capital High Yield Bond and Syndicated Loan Conference

- An April 21, 2011 press release emphasizing increased EBITDA and performance improvements

- The May 3, 2011 Form 10-Q

- A July 26, 2011 press release discussing improved performance and cash flow

- A July 26, 2011 conference call with investors, media representatives, and analysts

- The August 5, 2011 Form 10-Q

- A February 2, 2012 conference call with investors, media representatives, and analysts

- The February 23, 2012 Form 10-K consolidated financial statements for 2011

- The February 23, 2012 certifications pursuant to the Sarbanes-Oxley Act of 2002

Finally, even after Patriot filed its financial restatement, which acknowledged the Remediation Obligations should not have been accounted for as capital expenditures, plaintiffs allege the following misstatements:

- The May 8, 2012 Form 8-K depicted the financial restatement as having minimal impact to the company's financial position and condition. It stated that the restatement "has no impact on Patriot Coal's revenue or Adjusted EBITDA for any such prior period."

- The May 8, 2012 Form 8-K claimed that the company had identified a material deficiency in internal control over financial reporting associated with its accounting treatment for the Remediation Obligations. Patriot falsely claimed that it had "remediated [that] material weakness." Plaintiffs allege that subsequent filings indicate that "material weakness" in fact continued to exist, as demonstrated by the August 9, 2012 Form 10-K/A.

- The May 8, 2012 Form 8-K also made misleading or false projections regarding the company's financial outlook, only to be corrected by another Form 8-K on May 15.

- The May 22, 2012 Form 8-K and an incorporated letter sent the same day by defendant Whiting to employees did not disclose the full extent of doubts concerning the company's business prospects and painted an overly-optimistic portrait of the company's financial health.

Plaintiffs filed this action to recover damages they allegedly sustained for having purchased securities in a market affected by the above alleged misstatements. Count I of the Complaint alleges violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Count II alleges violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), which imposes liability on persons who influenced and controlled the dissemination of false and misleading statements. Count III alleges violations of Section 20(b) of the Exchange Act, 15 U.S.C. § 78t(b), which imposes liability on controlling persons who knowingly used a controlled person to commit an unlawful act.

## II.    Legal Standard

Defendants have moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act of 1995. The PSLRA modifies the Rule 12(b)(6) dismissal mechanism by setting forth exacting pleading standards for all

private rights of action brought under the Act. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007); *see also* 15 U.S.C. § 78u-4.

To prevail on their claims of material misrepresentation, plaintiffs must prove (1) a material misrepresentation by the defendants; (2) scienter; (3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance upon the misrepresentation; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, — U.S. —, 131 S.Ct. 1309, 1317-18 (2011); *Scott v. Enter. Fin. Servs. Corp.*, 947 F. Supp. 2d 1021, 1027 (E.D. Mo. 2013). On a typical Rule 12(b)(6) motion to dismiss, the Court must "accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party." *Cole v. Homier Dist. Co., Inc.*, 599 F.3d 856, 861 (8th Cir. 2010) (quoting *Coons v. Mineta*, 410 F.3d 1036, 1039 (8th Cir. 2005)). But under the PSLRA, "a securities fraud case cannot survive unless its allegations collectively add up to a strong inference of" scienter. *Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 660 (8th Cir. 2001); *see also* 15 U.S.C. § 78u-4(b)(1)-(2); *Tellabs*, 551 U.S. at 313; *In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 244 (8th Cir. 2008). Scienter is "the defendant's intention to deceive, manipulate, or defraud, or the defendant's severe recklessness." *Horizon Asset Mgmt. Inc. v. H & R Block, Inc.*, 580 F.3d 755, 761 (8th Cir. 2009) (internal quotations omitted).

As the Supreme Court explains,

To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible,

nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the "smoking-gun" genre, or even the "most plausible of competing inferences,".... Recall in this regard that § 21D(b)'s pleading requirements are but one constraint among many the PSLRA installed to screen out frivolous suits, while allowing meritorious actions to move forward. ... Yet the inference of scienter must be more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

*Tellabs*, 551 U.S. at 323-24 (internal citations omitted).

The Court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.* at 322 (citing 5B Wright & Miller § 1357 (3d ed.2004 and Supp. 2007). The defendants included numerous exhibits as attachments to their motion, including correspondence with the SEC, Form 4 filings, press releases filed on Form 8-K, and excerpts of Form 10-K filings — all of which are available publicly at the SEC's website ([www.sec.gov](www.sec.gov)). The plaintiffs have not objected to the defendants' citation to those exhibits.

With these principles in mind, the Court turns to the discussion.

## III.   Discussion

Plaintiffs allege that, during the nearly two-year Class Period, the defendants failed to properly account for the Remediation Obligations, which caused the company to appear

financially healthier than it was. Then, when forced to restate their financials, plaintiffs say the defendants provided wildly optimistic financial forecasts despite the fact that, according to plaintiffs, the defendants must have known bankruptcy was imminent. Plaintiffs assert that the facts illustrate that defendants committed fraud in a "last ditch" attempt to paint a fictitious picture about the company's financial viability in order to keep the company and their jobs afloat. Defendants counter that plaintiffs have not and cannot adequately allege scienter as required under the PSLRA.

Scienter "can be established in three ways: (1) from facts demonstrating a mental state embracing an intent to deceive, manipulate, or defraud; (2) from conduct which rises to the level of severe recklessness; or (3) from allegations of motive and opportunity." *Detroit Gen. Ret. Sys.*, 621 F.3d at 808 (quoting *Cornelia I. Crowell GST Trust v. Possis Med., Inc.*, 519 F.3d 778, 782 (8th Cir. 2008)). Upon consideration of the allegations as a whole, the parties' memoranda, and the applicable law, the Court concludes that the plaintiffs have not sufficiently alleged scienter to withstand the defendants' motion to dismiss.[2]

### A.    Accounting for the Remediation Obligations

Plaintiffs contend that defendants' accounting treatment of the Remediation Obligations  demonstrates at least severe recklessness. Plaintiffs assert that the

---

[2]The Court notes that, in order to consider the allegations "collectively" or "holistically" as required by *Tellabs*, it is permitted to discuss the allegations "one at a time." *Ceridian*, 542 F.3d at 246.

defendants' abrupt change in accounting methods coupled with "warnings" by the SEC specifically show that defendants knew their accounting methods were improper at the time. At the outset, the Court notes that "GAAP is an elaborate hierarchy of sources that accountants consult rather than a canonical set of rules." *Ceridian*, 542 F.3d at 246 (internal quotations omitted). Further, GAAP violations — even where they give rise to major financial restatements — without more do not give rise to a strong inference of scienter. *Id.* Plaintiffs assert that GAAP violations coupled with "red flags" that were ignored by defendants can raise an inference of scienter, citing *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 792 (11th Cir. 2010), but plaintiffs' alleged "red flags" are red herrings.

First, plaintiffs suggest that defendants must have known they were improperly capitalizing the Remediation Obligations because they had expensed the costs of earlier remediation efforts. But defendants explain that the accounting method changed because the nature of the remediation changed — earlier costs had gone to a system with minimal infrastructure and frequent replacement requirements, whereas the Remediation Obligations going forward involved constructing a 30-year facility spanning an area the size of two football fields. In addition, the facilities were expected to treat water flows from both active and inactive operations.[3]

---

[3]Plaintiffs assert that the Apogee mining complex where part of the Remediation Obligations had to be fulfilled was no longer being mined, and thus it was unreasonable for defendants to capitalize the expense related to selenium remediation there. However, the very document on which plaintiffs rely explains that all 78 Apogee outfalls with selenium problems

Second, plaintiffs suggest that the SEC's questions show defendants were at least reckless, and that the defendants' eventual restatement enhances that inference. although correspondence with the SEC ultimately caused defendants to change their accounting method, plaintiffs' suggested inference here — that the change in accounting method suggests nefarious intentions — does not stand up to the opposing inferences, which this Court "must" consider. *See Tellabs*, 551 U.S. at 323. The competing inference posed by defendants is that they believed the company was accounting for the Remediation Obligations appropriately. The company's independent auditor, Ernst & Young, along with Patriot's Chief Accounting Officer, believed it was appropriate to capitalize the Remediation Obligations under the circumstances. Notably, plaintiffs do not allege that the defendants withheld anything from either their independent auditor or CFO. Although plaintiffs accuse defendants of ignoring the SEC's "red flags," the inquiries originated from the SEC's Division of Corporation Finance, not the Division of Enforcement. There was never a formal inquiry or enforcement action by the SEC, nor any finding of misconduct or fraud. The mere existence of the SEC inquiries — in the absence of SEC findings of misconduct — do not imply misconduct or fraud occurred. *See Ceridian*, 542 F.3d at 248-9 (holding that allegations regarding an "on-going SEC investigation" where "no hearing or

---

"are located within active mining complexes," and it was not practicable to assign water flows occurring within the complex to particular subsets of the complex. (#55-8 at 3.) Moreover, it explains that the Apogee complex would continue to produce between 2.5 and 3.0 million tons of coal per year for the next 30 years and that the FBR facility was a requirement for mining the complex.

adverse findings" resulted supported inferences against the presence of fraud). Furthermore, the SEC did not ask any questions until September 26, 2011 — a year after the defendants disclosed that the company would capitalize the Remediation Obligations' costs. And the SEC correspondence demonstrates that the company based its accounting methods on its interpretation of Financial Accounting Standards Board principles and examples.

**B.    Company's disclosures**

The details of the company's disclosures further add to the strength of the inference in favor of defendants' innocent intentions. Defendants did not hide the cost of the Remediation Obligations — although they explained that they were capitalizing much of the costs, they also revealed that the facilities would cost $50 million and $25 million for the Apogee and Hobet facilities, respectively.[4] The company was forthcoming about its cash spending, which was unchanged by the May 8 restatement. Plaintiffs rely on *In re PainCare Holdings Securities Litigation*, in which defendants issued financial restatements for five consecutive years (nearly the entire financial life of the company), which reduced net the company's income by more than $36 million. 541 F. Supp. 2d 1283, 1287 (M.D. Fla. 2008). There, the original financial statements allegedly contained false valuations and expenses. *Id.* The plaintiffs suggested that those facts implied the defendants intentionally manipulated the financials in order to fuel the company's

---

[4]The company also explained in the October 21, 2010 press release that it would record an expense of $20.7 million (related to ongoing operations costs) in addition to the $50 million expected in capital investment for the FBR facility at Apogee. The $25 million cost for the ABMet facility at Hobet was revealed later.

aggressive growth strategy. *Id.* at 1292. In contrast, here, the plaintiffs have not alleged that the *values* assigned to the Remediation Obligations are inaccurate. Indeed, those numbers did not change, they were revealed to the market, and it is only the accounting *method* at issue. It is also noteworthy that, in contrast to the *PainCare* defendants, who offered no competing inference with respect to why the financials were inaccurate, the defendants here offer their own cogent explanation for why they accounted for the Remediation Obligations as they did.

This case is more akin to *Scott*, 947 F. Supp. 2d at 1027. There, the allegations went to accounting mistakes that were revealed when, after defendants spent two years "shopping" for accounting software, the software program they finally purchased revealed significant overstatements. Plaintiff there asserted that the magnitude and frequency of the errors, simplicity of the violated GAAP rule, and violations of the company's internal policies suggested that the defendants "should have known" that the financials were false at the time. *Id.* at 1026. The court there concluded that plaintiff had not pleaded scienter because the plaintiff's allegations relating to the availability of specialized software and consulting services did not permit the court to infer that defendants had reason to know of the errors in their accounting systems. *Id.* at 1029-30. The court observed that although plaintiff "makes a showing in hindsight that the statements were false," he "fails to plead adequate facts to show fraudulent intent." *Id.* at 1029 (internal quotations omitted). Similarly, although defendants here changed their accounting method after lengthy

discussions with the SEC, hindsight alone is not enough to show fraudulent intent or even recklessness. *See Ceridian*, 542 F.3d at 248. The facts were known to the market at all times, and plaintiffs' inference of intent or recklessness does not account for why defendants would set out to commit fraud while repeatedly and accurately explaining exactly how the company was treating the costs, including the exact amount of costs expected to be incurred. Notably, the defendants disclosed the ongoing communications with the SEC in their public filings.

Plaintiffs contend that the "core operations inference" suffices to support scienter — that is, knowledge of "facts critical to a business's core operations" may be imputed to individual corporate officers to support a finding of scienter. (#56 at 27 (citing *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1189 (C.D. Cal. 2008).) Plaintiffs themselves admit that whether the Eighth Circuit recognizes such an inference is an open question,[5] but it is difficult to see how it could help plaintiffs here. First, the company's "core operations" are coal mining, not accounting for the Remediation Obligations. Second, even if accounting for the remediation qualified as a fact critical to the company's core operation, it has already been established that the defendants were well-versed in the Remediation Obligations and their accounting. They spent months exchanging phone calls and letters with the SEC about it.

In addition, plaintiffs' allegations regarding the defendants' statements in

_____

[5]Plaintiffs cite to *Elam v. Neidorff*, 544 F.3d 921, 929 (8th Cir. 2008) ("We need not determine whether the core operations approach can be utilized to plead scienter."). (#56 at 27.)

courtrooms and during conference calls with the media and analysts do not add weight to the plaintiffs' scienter allegations. That the defendants testified in August 2010 that the company accounted for the ZVI tank systems as expenses (and not as capital expenditures, as they would for the FBR and ABMet facilities) does not serve to show that they intended to commit fraud when they later accounted differently for the Remediation Obligations — which had not yet been ordered by the West Virginia federal court. If anything, they show that the defendants were consistent in their treatment and understanding of the accounting methods applied to the Remediation Obligations up to the May 8 restatement. The fact that defendants continued to rely on the accounting methods inherent to the company's financial statements during conference calls before the May 8 restatement also does not serve to further scienter allegations. Ultimately, the allegations regarding the testimony and conference calls add nothing new to the analysis.

Finally, plaintiffs acknowledge that their allegations concerning defendants' internal control certifications "are insufficient to establish a strong inference of scienter by themselves," yet assert that they are "nonetheless relevant to a proper holistic inquiry." (#56 at 37 n.13). These allegations similarly add nothing new to the analysis because these allegations merely repeat that the defendants believed their accounting methods were proper.

**C.      The May 8 Restatement and Subsequent Filings**

The plaintiffs also point to the content of the May 8 restatement itself and

subsequent May 2012 statements as supporting a strong inference of scienter.  In particular, the May 8 Form 8-K stated that the "restatement has no impact on Patriot's revenue or EBITDA for any such prior period."  Plaintiffs assert that was false because it "depicted the restatement as having minimal impact to the Company's financial performance and condition."  (#51 at ¶ 84.)  But plaintiffs do not plead that the statement itself was false.  In addition, in the sentence preceding the one about which plaintiffs complain, the Form 8-K explains that the "restatement is increasing Patriot's asset retirement obligation expense and net loss by $23.6 million and $49.7 million for the years ended December 31, 2011 and 2010, respectively." (#55-22 at 2; *see also* #51 at ¶ 53.) Plaintiffs appear to agree that the Form 8-K's statement was literally true (#56 at 31 n.14), but they argue that it was misleading because it conveyed the false impression that the company "was prepared to readily surmount the impact of the restatement" (*id.*).  Plaintiffs have no legal support for that claim other than Rule 10b-5 itself.  But the Court cannot infer scienter from an admittedly accurate statement that was fronted with the concession that the company had just recorded massive net losses.

In addition, the company provided a financial outlook with the restatement on May 8 that it revised a week later due to subsequent "developments involving the potential default by a key customer."  Plaintiffs contend that the inference of scienter may be based on the one-week turnaround time — that because the defendants quickly changed the company's outlook, they must have had information at the time of the May 8 statement

that they deliberately or recklessly disregarded. Again, though, plaintiffs' "allegations rest on nothing more than hindsight." *Elam*, 544 F.3d at 930 (quoting *Fidel v. Farley*, 392 F.3d 220, 232 (6th Cir. 2004)). Defendants' competing inference — that the company was itself a victim of the quickly-changing coal market — is stronger. As will be discussed further below, defendants had nothing to gain by quickly disclosing corrective information. Plaintiffs do not explain why defendants corrected the information so quickly if defendants were trying to cast a rosy glow on the company in order to gain financing. Plaintiffs provide no confidential witness information nor any other details to suggest defendants must have known the customer would default[6]. Conjecture alone does not suffice. *Id.*

The May 22 statement consists of a letter defendant Whiting sent to Patriot Coal employees. That letter was disclosed in another Form 8-K. The plaintiffs highlight the letter's statements (1) that the company had "'engaged the Blackstone Group,' a financial services company well-known for its role in assisting companies restructure their debt, 'to achieve an optimal financing package'" and (2) that "'operations are performing well' and that the Company is positioned for 'future growth.'" (#51 at ¶ 59.) Plaintiffs contend that the letter was "upbeat" and "did not fully disclose the truth about the Company's impending bankruptcy." (*Id.*) Plaintiffs do not actually point to any misstatements in the

---

[6]The Court notes that the May 15 correction advised of a "potential default" by an important customer. Had the correction advised of an actual default, it may be natural to assume the company had earlier inklings of its potential default. Here, though, the company is disclosing the potential for a later default.

letter; rather, they seem to contend that defendants should have disclosed that the company was considering bankruptcy. But plaintiffs do not have any evidence that the defendants were considering bankruptcy. The May 22 letter states that they had received a commitment for a $625 million loan/credit package, and plaintiffs do not allege that such information was false, nor do they allege that any other information conveyed in the letter was false. Curiously, although plaintiffs contend that the letter was "upbeat," they also allege that the "letter partially disclosed issues related to the Company's capital position and hinted at potential problems." (#51 at ¶ 122.) In addition, plaintiffs alleged that "rumors regarding potential bankruptcy became public." (*Id.*) Then plaintiffs allege that the company's share price fell from $3.36 to $2.18 — a 35% decline — on that news. Yet plaintiffs maintain that the plaintiffs should have disclosed the "material risk of bankruptcy" (#56 at 33) at that time. The company would not file for bankruptcy for six more weeks — after defendant Whiting resigned. Notably, the CEO who replaced Whiting made public statements without stating that bankruptcy was on the horizon, and for good reason: there exist "public policy justifications for allowing a company operating near insolvency to make careful deliberations about its future, free from any obligation to disclose potential bankruptcy." *Beleson v. Schwartz*, 599 F. Supp. 2d 519, 527 (S.D.N.Y. 2009), *aff'd*, 419 F. App'x 38 (2d Cir. 2011). Even if defendants had been considering bankruptcy, "failure to disclose bankruptcy planning [does] not make...other disclosures misleading." *Id.* at 527 (quoting *In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327, 348

(S.D.N.Y. 2007)).[7]

### D. Motive

Plaintiffs contend that defendants were motivated to account for the Remediation Obligations improperly and falsely assure the marketplace of the company's financial health because they sought to protect their jobs and generous compensation.[8] That is, the financial ramifications of the Remediation Obligations were so great that, plaintiffs say, defendants knew they would mean certain doom for the company and their jobs.

"A complaint must show that the benefit to an individual defendant is unusual, for example, that the benefit is of an overwhelming magnitude and received under suspicious circumstances." *Horizon Asset Mgmt.*, 580 F.3d at 766 (quoting *In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1085 (8th Cir. 2005) (internal quotation omitted). For example, "a timing coincidence" may supply the special circumstances: e.g., a $102 million benefit to an individual defendant with an alleged overstatement of earnings that took place just as the individual defendant's contract was to expire. *Cerner*, 426 F.3d at 1085 (citing *Green Tree Fin. Corp.*, 270 F.3d at 661).

---

[7]As the District Court in *Beleson* noted, "[a]ny standard mandating disclosure of contingent bankruptcy planning would put an unacceptable burden on corporations and their officers. Such a standard might amount to a self-fulfilling prophecy, ensuring that all companies that begin contingent preparations for bankruptcy would inevitably go bankrupt because, upon disclosure of the plans, investors would immediately lose confidence in the company and close the capital markets." 599 F. Supp. 2d at 527.

[8]Defendant Whiting's compensation for 2010 and 2011 totaled $8.6 million. Defendant Schroeder's compensation for that time period was $3.7 million.

In contrast, the "desire to make a company seem more profitable is a desire universally held among corporations and their executives, and thus insufficient to support an inference of scienter...." *Horizon Asset Mgmt.*, 580 F.3d at 766 (quoting *Cerner*, 425 F.3d at 1085 (internal quotation omitted)). Plaintiffs have alleged nothing more than the usual circumstances of executive employment here. In support, plaintiffs cite a number of cases from other circuits, but those plaintiffs each offered specific allegations going to motive in addition to the universal motivations of keeping the company (and executive employment) afloat. In *In re Cabletron Systems, Inc.*, for example, the defendants knew about problems with a product rollout that directly contradicted the company's public statements; in addition, the defendants allegedly engaged in insider trading just before "the worst of the news" was disclosed. 311 F.3d 11, 39-40 (1st Cir. 2002). Although the future of the company may have been at stake for Patriot Coal, there are no allegations of bonuses or any suspicious timing. In fact, defendants actually increased their holdings of Patriot Coal shares during the class period. There are thus no allegations of insider trading, which further decreases any inference of scienter. *See Cerner*, 425 F.3d at 1085; *Kushner v. Beverly Enterprises, Inc.*, 317 F.3d 820, 830 (8th Cir. 2003) ("The defendants' stock would have been affected by the same downturn in prices as were the investors' stocks"); *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 894 (8th Cir. 2002) ("evidence that the individual defendants abstained from trading may undercut allegations of motive"); *Scott*, 947 F. Supp. 2d at 1030 (observing that plaintiff had not alleged that

defendants "had any motive, such as insider trading, to make false or misleading

statements"). Of course, the absence of insider trading allegations is not dispositive to the

matter of scienter, but the absence of both those allegations and allegations going to other

suspicious activity are part of this Court's holistic inquiry.

* * *

This appears to be a rather unique case in that defendants are accused primarily of

manipulating an accounting method to defraud the market rather than falsifying the

numbers themselves. "One of the classic fact patterns giving rise to a strong inference of

scienter is that defendants published statements when they knew facts or had access to

information suggesting that their public statements were materially inaccurate." *Green

Tree Fin. Corp.*, 270 F.3d at 665. Despite the fact that GAAP errors do not by themselves

create a strong inference of scienter, *Ceridian*, 542 F.3d at 246, such a fact pattern is of

course possible in an action based on an accounting problem. Plaintiffs in *Green Tree*, for

example, alleged that the company knew that its mortgage loans were being paid off more

quickly than their assumptions indicated, but that their financial statements did not account

for the disparity between their assumptions and what actual experience had taught them.

*Id.* "The complaints alleged that the defendants were informed of the actual prepayment

rates on at least a monthly basis." *Id.* When the problem was revealed, it resulted in a

$390 million write-down. *Id.* The Eighth Circuit there held that those allegations gave

rise to a strong inference of scienter. *Id.* The *Green Tree* defendants attempted to argue

that the complex accounting issues at hand rendered them blameless, and the Eighth Circuit held that *that* was issue for trial — but in light of the fact that actual prepayment rates were much higher than what was accounted for in the financials, in addition to the CEO's $65 million to $102 million salary and other incentives, plaintiffs had pleaded scienter as required by the PSLRA. *Id.*

Unlike the plaintiffs in *Green Tree*, the plaintiffs here cannot provide a cogent and compelling inference of scienter when compared to explanations provided by the defendants. "Without a showing of motive or opportunity, other allegations tending to show scienter ... have to be particularly strong in order to meet the [PSLRA] standard." *K-tel*, 300 F.3d at 894. Here, plaintiffs have pieced together their interpretation of the facts in an effort to plead scienter, but the Supreme Court advises that the inference "must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. That is, the inference must be "strong in light of other explanations." *Id.* at 324. Plaintiffs characterize the defendants' explanations as defenses to be used at trial, but this Court must consider them now. *Ceridian*, 542 F.3d at 245 ("it is an inquiry that must be made, however awkward or unusual, because it has been mandated by Congress to remedy widespread abuse of the Rule 10b-5 class action device"). Defendants did capitulate to the SEC's position on accounting for the Remediation Obligations, but that was after eight months of discussions and years of certifications by outside accountants. Defendants

explained why they believed the Remediation Obligations were fundamentally different from their other remediation activities. Unlike in *Green Tree*, plaintiffs here did not show that defendants had access to information or facts showing the accounting or facts underlying the accounting was wrong or even severely reckless. The letters exchanged with the SEC show that defendants had reason to capitalize the Remediation Obligations, and those reasons were supported by outside accountants. Again, plaintiffs do not suggest an improper relationship with the accountants nor that the accountants were lied to. Moreover, the values inherent to the accounting were fully and accurately disclosed. *Cf. Green Tree Fin. Corp.*, 270 F.3d at 661 (finding sufficiently alleged scienter where defendants relied on data they knew to be wrong for their accounting); *PainCare*, 541 F. Supp. 2d at 1287 (finding sufficiently alleged scienter where allegations included that the false financial statements included false valuations and expenses). Ultimately, the stronger inference is that the defendants believed they were accounting appropriately for the Obligations. As in the recently-decided *Scott* case, the allegations here are largely premised upon hindsight and conduct that rises to the level of corporate mismanagement, but not severe recklessness. *See Scott*, 947 F. Supp. 2d at 1030; *Horizon Asset Mgmt.*, 580 F.3d at 766 (holding that "a plaintiff must allege more than 'incompetence' or corporate mismanagement before a claim of negligence rises to the level of securities fraud"); *Ceridian*, 542 F.3d at 249.

The plaintiffs argue that their cumulative allegations support a strong inference of

scienter — the motive to ensure survival of the Company, the magnitude of the GAAP violations and restatement, the "abrupt" change in accounting policy, the SEC's criticism, and the importance of coal mining to the company's core operations. But when viewed in light of defendant's explanations for their accounting decisions, the full and accurate disclosure of the values underlying the financial statements, the facts regarding the content of the May 8 restatement, the prompt correction of the May 8 revenue forecast, as well as the fact that defendants themselves did not benefit financially from stock sales or in some other unusual way, the plaintiffs' allegations simply do not support a strong inference of scienter.

## IV. Conclusion

Having determined that the plaintiffs have not pleaded scienter sufficiently to maintain their primary claim, the Court must also dismiss their Section 20(a) and Section 20(b) claims in Counts II and III, which are predicated in part on a Section 10(b) claim. *Navarre*, 299 F.3d at 748; *Union Cent. Life Ins. Co. v. Credit Suisse Sec. (USA), LLC*, 11 CIV. 2327 GBD, 2013 WL 1342529, *9 (S.D.N.Y. Mar. 29, 2013). The defendants' motion to dismiss will be granted.

Dated this ___18th___ day of March, 2014.

_____
STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE